

# NUMBER 13-18-00632-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF L.S., A CHILD

**On appeal from the County Court at Law No. 5
of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Hinojosa
Memorandum Opinion by Justice Benavides**

By two issues, appellant L.S. (Mother) challenges the legal and factual sufficiency of the evidence supporting the statutory grounds for termination of her parental rights to her child, L.S. (Child), as well as the trial court's best interest finding.[1]   We affirm.

---

[1]   To protect the identity of the minor child, we will utilize aliases for the child and refer to the parents as Mother and Father.   *See* TEX. FAM. CODE ANN. § 109.002(d) (West, Westlaw through 2017 1st C.S.); TEX. R. APP. P. 9.8(b)(2).   Although the trial court terminated both parents' parental rights, Mother is the only parent to appeal the trial court's judgment.   Therefore, this Court will only discuss the trial court's judgment as it pertains to Mother.

## I.    BACKGROUND

The Department of Family and Protective Services (the Department) filed its petition for protection, conservatorship, and termination of Mother's parental rights in August 2017.   In its petition, the Department alleged numerous violations of family code section 161.001(b)(1) and asked for the immediate removal of Child due to a Facebook post showing Child with bruises, lying near an unknown man and within reach of a semi-automatic rifle.   *See* TEX. FAM. CODE ANN. § 161.001(b)(1) (West, Westlaw through 2017 1st C.S.).   The Department filed an amended petition after discovering the identity of L.Z., Father.   Father signed a voluntary relinquishment of his parental rights prior to trial.

### A.    Procedural History

On August 22, 2017, the Department filed its petition to remove Child, age three, from Mother.   Mother was incarcerated in Bandera, Bexar, and Nueces Counties from September 2017 to January 2018 on different unrelated charges.   She was released from custody and went to a women's shelter in the Corpus Christi area, then subsequently began living with a paramour.   On January 31, 2018, Mother tested negative for any illegal drugs on a hair follicle test and completed a psychological evaluation.   However, the psychologist recommended Mother have a psychiatric evaluation, which Mother did not complete.

In March 2018, documentation provided to the trial court showed that Mother refused to get treatment for her mental illness issues, was participating in criminal activity, had no stable home, and had provided no documentation showing she attended the classes required in her family service plan.   Mother also tested positive for methamphetamine on March 22 and April 2, 2018 in hair follicle tests.   Mother claims

that "someone" was placing drugs in her shampoo; she made no efforts to receive drug treatment or counseling. Later, she ceased contact with the Department. Mother was arrested for aggravated assault with a deadly weapon in May 2018. The termination hearing was held in October 2018.

**B.      Trial on the Merits**

   **1.      Department Workers**

Danette Valdez, the Department investigator, testified to her extensive involvement in the case. Valdez stated she was there when Mother voluntarily gave Child to Mother's Great-Uncle (Great-Great-Uncle) in June 2017 after the Department received a report about Mother. Valdez explained that when Department workers contacted Mother, they took law enforcement with them due to past history with Mother and for everyone's safety. When Valdez and law enforcement arrived, Mother seemed to be under the influence or in a "manic" state, keeping her back to them and refusing to make direct eye contact. Valdez described the apartment as a "mess" with boxes strewn about, broken glass covering the floor under the windows, rat poison within reach of Child, and a smell of marijuana. Valdez also explained that the closet on the ground floor was barricaded and Mother stated that "people were coming in through the closet." Mother also stated that "things were moved around or missing" and that undercover "cops" and neighbors were always trying to steal from her. Mother also explained to Valdez that she had been "drugged for days," there were "ghosts" in the house, and that Child saw the ghosts too. Mother refused a drug test at that time.

Valdez testified that she had history with Mother and that Mother had been diagnosed bipolar and schizophrenic but did not take her medications because she did

3

not feel she needed them. Mother told Valdez that Mother and Child slept on bunk beds in the living room of the two-story, two-bedroom apartment for safety. Mother also stated she had the glass under all the windows to prevent people from breaking into the apartment. Valdez noticed that the back door of the apartment had a two-by-four nailed across it, preventing access into or out of the apartment. Mother told Valdez that she had not left the apartment in a month because she was afraid people would break into the apartment while she was gone and that Child had been with her that entire time. Mother did say that friends would bring them food as needed. Mother agreed to let Child go with family members and stay with Mother's Aunt (Aunt) so she could get the apartment cleaned up. Great-Great-Uncle took Child and transported him to Aunt, who resided out-of-state.

Valdez testified about her interactions with Mother in July 2017. Mother agreed to a drug test, but never appeared. Mother also told Valdez to talk to members of the Corpus Christi Police Department about being targeted by undercover officers, but Valdez said she followed up with the police department and that was not the truth. Valdez visited Mother again, and the apartment was very clean. There was an unknown male at the apartment who refused to speak to Valdez, and Mother showed Valdez eviction notices at that time. Later that month, Aunt called Valdez because Mother was adamant about having Child back in her custody. Valdez agreed with Mother's attorney that there was no formal removal of Child when Aunt took custody.

Valdez asked Mother to make contact when she returned to Corpus Christi with Child in early August, but Mother did not. Valdez then saw the photograph posted on Facebook of Child laying on a bed with an unknown male, bruises apparent on his back,

4

and within reach of an AK-47 firearm.   Valdez again went to the apartment, accompanied by law enforcement, with removal documentation from the trial court.   Mother refused to answer the door, even though Valdez had seen her through an apartment window. When Valdez called Mother, Mother told her she was at the grocery store.   A writ of attachment for Child was obtained and the Corpus Christi Fire Department had to use a device to force the door open.   Valdez described Child as scared when he was brought to her and Child asked Valdez if "she was bad."   Valdez explained that she immediately took Child to Great-Uncle so he would feel safe and was there when Child was turned over to Mother's father (Grandfather).

Carol Sanchez, a conservatorship worker with the Department, also testified to her interactions with Mother.   Sanchez testified about the family service plan created by the Department.   Sanchez explained that Mother made little progress on the plan and that Mother did not have visits with Child due to a protective order that was in place for Mother's family.[2]   Sanchez also testified that Mother never attempted to find stable employment and had told Sanchez that she did not feel she needed a traditional job, even though Mother has a college business degree.   Sanchez stated that Mother did not complete individual counseling or parenting classes, had irregular contact with the Department, and did not participate in drug assessments or treatment programs.   Mother did allow a home visit during which the apartment was clean, and Mother showed Sanchez a tent she had set up for Child.   However, Sanchez was concerned because

---

[2] Mother's family obtained a protective order against her after she made repeated threats to their safety while Child was in their custody.

there was no food; there was a knife present near the door; and Mother did not allow Sanchez access into the apartment on other occasions. Sanchez also explained that throughout the case, Mother posted concerning things on Facebook, made concerning statements regarding the safety of Child, and made "nonsense" statements about drugs. Although Sanchez felt Mother did care for Child, she stated Mother only asked Sanchez to tell Child once that Mother loved him and that Child does not ask about Mother when Sanchez has seen him. Sanchez felt it was not in Child's best interest to know Mother in her current state and that the goal of the Department was now relative adoption.

### 2. Corpus Christi Police Officers

Officers Jason Lee, Jennifer Collier, and Tracy Roberts of the Corpus Christi Police Department all testified to involvement with Mother.

Officer Lee was present when Mother agreed to let Great-Uncle take Child in June 2017. Officer Lee stated he received a welfare call from Great-Uncle and they had been called out to Mother's apartment before. Officer Lee agreed the apartment was "filthy," with little food, rat poison visible, and broken glass on the floor. Officer Lee stated Child was dirty and not wearing shoes while around the glass. Mother agreed to allow Great-Uncle to take Child so she could clean. Officer Lee stated the previous calls to Mother's apartment had been regarding "people coming in through the closet" and Great-Uncle gave Officer Lee some "weird" written notes from Mother.

Officer Collier responded to an incident report in February 2018 at an apartment in Corpus Christi leased by Muhamad Rashid. Rashid was Mother's paramour and had allowed Mother to stay with him after she was released from the women's shelter. The landlord, Michael Barnes, and Rashid requested police assist them in evicting Mother

6

from Rashid's apartment. When they entered the apartment, there was drug paraphernalia with residue in plain view and items that did not belong to anyone in the apartment found inside. However, Officer Collier stated that because no one took responsibility for the drugs or stolen items, no arrests were made at that time.

Officer Roberts testified that she works off-duty for the Corpus Christi Housing Authority (CCHA) and Mother resided in a CCHA apartment. Officer Roberts stated that, in July 2017, she received a call from Grandfather[3] asking her to check on Mother, as well as an anonymous tip regarding drug use and foot traffic in Mother's apartment. Officer Roberts found the apartment to be cluttered and filthy. Officer Roberts felt that Mother was "wired up" and stated that her partner found a scale with drug residue on it inside the apartment. Officer Roberts testified that she was also present on the day Child was forcibly removed from the apartment. Officer Roberts testified she was one of the officers who made entry into the apartment and found Mother, Child, and another woman in an upstairs bedroom. Officer Roberts had Mother walk into the hallway, so that Child would not see her being arrested. Once in the hallway, Mother resisted arrest, but was eventually apprehended for interference with child custody.

### 3. Additional Witnesses

Barnes testified to his interactions with Mother. Barnes was the landlord of an apartment rented by Rashid, a paramour of Mother's. Rashid had allowed Mother to stay at his apartment in February 2018 for a few days, but Rashid ended up leaving the apartment when Mother continued to invite strangers over and use drugs. Barnes and

---

[3] Grandfather and Great-Uncle are both retired Corpus Christi Police Department officers.

Rashid called police in February 2018 in order for Rashid to collect his belongings. Upon entry into the apartment, Barnes saw drug needles and stolen items everywhere. Barnes tried to evict Mother but was unsuccessful until May 2018 through a court order even though Mother never paid any rent. Barnes provided photographs of extreme damage to the apartment Mother caused upon leaving that he had to repair at his own cost.

Angelina Garcia from the Catholic Charities of Corpus Christi testified that she met Mother through the Parents as Teachers program prior to the removal. Mother had been referred to the program from another parent-assistance program Mother participated in when Child was an infant. Parents as Teachers works with parents of children from age two to five years old. Garcia testified that Mother and her home changed when Mother's ex-boyfriend R.Y. appeared in the picture. Garcia explained that towards the end of Mother's participation, they had to take two volunteers for the required home visits due to safety concerns. Garcia saw on Facebook that Mother was renting out her bedrooms to random people, but Mother did not see any issue with it when Garcia addressed her. Garcia believed that Mother was "out of it" on the last home visit, the home was in disarray, and Mother and Child were sleeping on bunkbeds in the living room. Mother did not complete the program because the workers felt that they were unable to continue with the teaching modules required and at the end, the visits were to check on Child's well-being. Garcia also testified that she reported her concerns to the Department.

Markell Rowe was the CASA volunteer assigned to this case. She testified that Child was secure in his current placement and they are a close family. Rowe stated that Child has said to her that "Mommy lives in jail." Rowe had spoken with Mother but felt

8

that Mother continued to direct conversation to herself, instead of focusing on Child. Rowe agreed that she never saw Mother with Child due to the visitation restrictions, and Rowe would want to allow Mother back into Child's life if she could be a good parent. Rowe also agreed that the family members have expressed how difficult this situation is on them and that Mother will always be Child's mom.

### 4. Expert Witnesses

John Tarver, the lab manager for Quest Diagnostic, testified as an expert witness regarding the hair follicle samples. He explained that they test what is inside the hair sample, not any outside residue, so Mother's statement that "someone was drugging her shampoo" would not have resulted in a positive test for methamphetamine. Tarver testified that Mother was positive for methamphetamine from the sample collected on March 22, 2018.

Dr. Robert Rios, a psychologist, testified regarding his evaluation of Mother from February 2018. Dr. Rios stated that Mother self-reported a history of post-traumatic stress disorder, depression, and methamphetamine use. He did not feel Mother was depressed or under the influence of drugs at the time of his evaluation. Dr. Rios expressed concern with Mother's lack of income and housing and explained she made statements regarding delusions she had that he felt warranted psychiatric referral. Dr. Rios also agreed that delusions could be a symptom of methamphetamine psychosis. Dr. Rios also described Mother as emotional when discussing Child.

### 5. Family Members

Although Child was placed with Grandfather and Mother's step-mother (Grandmother), additional family members were heavily involved in Child's daily life.

Aunt testified that Mother had been diagnosed as bipolar with borderline personality disorder in the past. Sister agreed to care for Child in the summer of 2017 because she was worried about Mother's mental state. Although Mother had originally agreed to this arrangement, Mother changed her mind and told Aunt that she was going to have a semi-truck driver pick Child up to return him to Corpus Christi. Aunt refused, and Mother called Aunt's husband's commanding officer (CO) in the United States Air Force. The CO told Sister and her husband to return Child because they did not have legal authority to keep him. Mother drove to their hometown in Colorado and showed up with an unknown male in a van.

Aunt testified that Mother and she had an estranged relationship because Aunt did not want Mother to be around her own children due to her behavior. During the pendency of the case, Mother messaged Aunt repeatedly, ranging from nonsensical statements to threats. Aunt does not think Mother can properly care for Child and does not think getting help would be enough to safely return Child to Mother's care.

Great-Uncle testified that he allowed Mother to live with him while she was pregnant and for the first two years of Child's life. Great-Uncle agreed they got along well but she refused to follow his rule regarding no drug use in the home.[4] Mother lived with Great-Uncle until she was approved for government housing, and he stated that he and his wife would visit Mother and Child frequently. Great-Uncle described Mother as a responsible parent when she was going to treatment at the mental health center and taking her medications. Great-Uncle stated that, on the day Mother allowed him to take

---

[4] Great-Uncle testified that Child had found a marijuana pipe in the backyard of Great-Uncle's home, but Mother just brushed it off when he confronted her with it.

Child to Aunt, the apartment had glass all over and Child was eating next to a box of rat poison. He believed that once she moved into the apartment, she began over-using methamphetamine and based on his experience as a former police officer, her paranoia and delusions were consistent with methamphetamine use. He thinks she can possibly be part of Child's life if she can get her own life back on track.

Grandfather explained that he was a twenty-year law enforcement officer, mainly in narcotics. He said Mother had been diagnosed with bipolar disorder and had been to two mental health programs when she was younger. Grandfather stated Mother was very smart, did well in school, and had a business degree. Grandfather believed that when he saw Mother at the apartment, he could tell she was using drugs and the paranoia she exhibited was typical of methamphetamine use. Even though Grandfather was in a very serious accident in June 2017, he had recovered enough to take care of Child in August 2017. He testified that Child has discussed sexual abuse from people in Mother's home, was always dirty when they had visitations with him, and never had proper clothing when he came to visit. Grandfather admitted that he was worried about Mother, but that she is an adult and they need to worry about Child now. Grandfather does not think Mother can take care of herself, let alone Child, and states that the family has done all that they can to help Mother. Grandfather admits Mother could do the programs but does not believe that she will complete them and thinks termination is best for Child.

Grandmother testified that, when they took custody of Child, he was "filthy," covered in bug bites, had feces in his underwear, and was scared. Child kept saying he was "scared of bad people coming to take him." Grandmother explained that Child would whimper in his sleep and it took some time for him to feel safe. Once Child was

11

placed with them, Mother would text or send Facebook messages threatening Grandmother and her family. At one point, the messages went on for two days straight and Grandmother eventually filed charges for harassment and terroristic threats against Mother.

Grandmother testified that Child is doing great with them; he is in tee-ball, goes to school, and is in play therapy. Child identifies pictures of Mother in their home but does not say more about her. Grandmother feels Child's safety and well-being has improved drastically with them and they must protect Child now. She feels Mother's rights should be terminated and they plan to adopt Child.

**6. Mother**

Mother testified in her defense. She stated she had just gotten out of jail the week prior and that a "friend" was setting up an apartment for her, but she had not seen the apartment. Mother did not know the required rent but said she would be working for her "friend" in his landscaping business. Mother agreed that she had not had a stable living arrangement since she was evicted from the government apartments for having the "drug" scale. Mother said she runs a "store" where she sells items online that are unwanted. Mother testified that her ex-boyfriend, R.Y., was great and they were a "happy family." But when R.Y. started using drugs, he was different. Mother explained there was an incident involving her hand getting cut by a knife, but it was a misunderstanding and R.Y. was not trying to hurt her, even though he was arrested for aggravated assault. Instead of seeking medical treatment, Mother tried to stitch up the cut herself because she was afraid to leave her apartment. Mother claimed "people" (which included law enforcement officers) had gone in while she was talking to the police and unlocked her windows.

12

Mother stated she only used drugs "occasionally." In response to questioning, Mother described her life as "cyclical" where things were good and then bad for her and she was trying to "fix herself." However, Mother blames her issues 100% on her family and stated they were "out to get her." Throughout her testimony, Mother's statements mostly related to her issues, and very little was said regarding Child.

### 7. Trial Court Ruling

At the conclusion of the evidence, the trial court found that termination was appropriate under section 161.001(b)(1)(D), (E), (O), and (P), and was in Child's best interests. *See id.* § 161.001(b)(1)(D), (E), (O), (P), & (b)(2).

## II. SUFFICIENCY OF THE EVIDENCE

By her first issue, Mother alleges there was legally and factually insufficient evidence presented at trial to support the trial court's findings and to terminate her parental rights.

### A. Standard of Review

A court may order the termination of a parent-child relationship if it is shown by clear and convincing evidence that a parent has met at least one of the statutory factors listed in section 161.001 of the family code, coupled with an additional finding by clear and convincing evidence that termination is in the child's best interest. *See id.* § 161.001(b)(1)–(2); *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2002) (noting the two-prong test in deciding parental termination and that one act or omission of conduct satisfies the first prong); *In re E.M.N.*, 221 S.W.3d 815, 820–21 (Tex. App.—Fort Worth 2007, no pet.). "Clear and convincing evidence" is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the

allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2017 1st C.S.). "This intermediate standard falls between the preponderance of the evidence standard in civil proceedings and the reasonable doubt standard of criminal proceedings." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.). This heightened standard of review is mandated not only by the family code, *see* TEX. FAM. CODE ANN. § 161.001, but also the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)). "It is our obligation to strictly scrutinize termination proceedings and strictly construe the statute in favor of the parent." *In re L.J.N.*, 329 S.W.3d at 673.

In a legal sufficiency review, we look at all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We "must consider all of the evidence, not just that which favors the verdict." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Furthermore, we must assume that the factfinder resolved disputed facts in favor of its findings if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *In re J.F.C.*, 96 S.W.3d at 266. If, after conducting a legal sufficiency review, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient and render judgment in favor of the parent. *Id.*

In reviewing challenges to factual sufficiency, we should "inquire 'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about

14

the truth of the [] allegations'" from the entire record. *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* However, in applying this standard, we must not be so rigorous in our analysis that the only fact findings that could withstand review are those established beyond a reasonable doubt. *Id.*

### B. Applicable Law and Discussion

The trial court found that termination was appropriate under section 161.001(b)(1)(D), (E), (O), and (P), and was in Child's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P), & (b)(2). Because termination is sufficient if at least one of the factors is found along with the best interests finding, we will discuss section 161.001(b)(1)(D) and (E) only. *See id.* § 161.001(b)(1)(D), (E).

#### 1. Section 161.001(b)(1)(D) and (E)

Family code section 161.001(b)(1)(D) allows termination if: "the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(D). Section (E) allows termination if: "the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). As these grounds address similar requirements, we will address them together.

"To endanger means to expose to loss or injury, to jeopardize." *In re E.M.*, 494 S.W.3d 209, 221 (Tex. App.—Waco 2015, pet. ref'd). "Both subsections thus require

15

'endangerment'—that is jeopardizing the child's physical or emotional well-being." *In re of R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. ref'd.) "But they differ as to the cause of the endangerment." *Id.* "Under both subsections, therefore, termination must rest upon parental conduct. But subsection D permits termination because of a single act or omission, while subsection E requires a 'course of conduct.'" *Id.*

> Subsections D and E also differ in the relationship each requires between the parental conduct and the endangerment. Subsection D requires the endangerment to be the direct result of the child's environment and only an indirect result of a parental act or omission; subsection E, on the other hand, requires the endangerment be a direct result of parental conduct. Subsection D thus permits a less than direct relationship between the parental conduct and the endangerment but it also requires an additional factor—an endangering environment—to be proved, while subsection E requires a direct relationship but this relationship, standing alone, justifies termination.

*Id.* at 367–68.

Under subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential danger which the parent is aware of but disregards." *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see In re R.S.-T.,* 522 S.W.3d 92, 109–10 (Tex. App.—San Antonio 2017, no pet.) (regarding what the trial court can consider under subsection E for termination).

Under Subsection D, the June 2017 incident could be sufficient to support the trial

court's finding. Subsection D requires a "single act or omission" and the endangerment to be a "direct result of the child's environment." *In re R.D.*, 955 S.W.2d at 367–68. When law enforcement officers, the Department, and Great-Uncle visited Mother on that day, the apartment was dirty and cluttered, with boxes strewn about. But what concerned the visitors most that day was the rat poison laying within Child's reach and the broken glass littering the living room floor. Witnesses testified that Child was dirty and barefoot and Mother told witnesses that she and Child slept in the living room on bunkbeds. Besides the conditions of the apartment, Mother was acting strangely, speaking with her back to people and refusing to make eye contact, while referencing people coming in through the closet. That type of environment endangered Child and could have harmed his physical or emotional well-being. *See id.*

Subsection E requires there to be a "course of conduct" with the endangerment being a "direct result of parent conduct," and the parent being aware but disregarding the danger. *Id.*; *see In re S.M.L.*, 171 S.W.3d at 477. There was substantial testimony to support that Child was not only placed in the endangering environment as described above, but also that Mother rented out her bedrooms to strangers, allowed unknown men into the home when the Department was present, refused to leave her home for weeks at a time because she was afraid someone would break in and steal her belongings, saw ghosts in the apartment, and had an ongoing methamphetamine addiction. Even though multiple witnesses spoke to Mother about her living arrangements and lack of employment, Mother did not understand the issues and concerns and tried to dismiss them. The environment Mother placed Child in was a direct result of parental conduct in which Mother was made aware of the dangers but chose to continue in the manner she

17

lived.   *See In re R.D.*, 955 S.W.2d at 367–68.

The trial court had an overwhelming amount of evidence to make its determination and we find the evidence was legally and factually sufficient to support the determination under subsection D and E.   We overrule Mother's first issue.

### 2.   Best Interest of the Child

We must next determine whether there was clear and convincing evidence that termination of Mother's parental rights is in Child's best interest.   *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 261.   We must decide how to "reconcile 'a parent's desire to raise [the] child with the State's responsibility to promote the child's best interest.'"   *In re O.R.F.*, 417 S.W.3d 24, 39 (Tex. App.—Texarkana 2013, pet. denied) (citing *In re E.R.,* 385 S.W.3d 552, 555 (Tex. 2012)).   "There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome that presumption."   *Id.*   "Termination 'can never be justified without the most solid and substantial reasons.'"   *In re N.L.D.,* 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In deciding what is in the "best interest of the child," we look to the following factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re B.R.,* 456 S.W.3d 612, 615–16 (Tex. App.—San Antonio 2015, no pet.) (quoting

18

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). "These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate." *In re D.C.*, 128 S.W.3d 707, 716 (Tex. App.—Fort Worth 2004, no pet.). "Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children." *Id.* "On the other hand, the presence of scant evidence relevant to each *Holley* factor will not support such a finding." *Id.* "Additionally, the Family Code lists thirteen similar factors for determining the parents' willingness and ability to provide a safe environment." *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.— Houston [14th Dist.] 2003, no pet.) (citing TEX. FAM. CODE ANN. § 263.307 (West, Westlaw though 2017 1st C.S.)).

### (a) the desires of the child

Child in this case was only four years old at the time of trial. Although his desires were not directly referenced during the trial, there was testimony about things he said to different witnesses. At one point, Child identified photographs of Mother at Grandfather's home and knew she was his mother. However, Grandmother stated he did not inquire about Mother. Another witness stated that when Child saw a picture of Mother, he stated "My mommy lives in jail." Although Child recognizes who Mother is, he had not asked for her or expressed emotions regarding Mother. Since there was a protective order in place in this case, Mother had not had visitations with Child. Since Child did not express his desires in any way, this factor is neutral towards termination.

### (b) the emotional and physical needs of the child now and in the future
### (c) the emotional and physical danger to the child now and in the future

The emotional and physical needs of the children are of paramount concern. *In re R.A.G.*, 545 S.W.3d 645, 651 (Tex. App.—El Paso 2017, no pet.). The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *Id.* A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *See id.*; *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied) (explaining that evidence of past misconduct or neglect is a permissible inference that a parent's future conduct may be measured by their past conduct). Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.A.G.*, 545 S.W.3d at 651.

There was overwhelming evidence supporting these two factors. Multiple witnesses testified that Mother did not have permanent, stable housing after being evicted from her CCHA apartments. Mother, in essence, took over Rashid's apartment and was evicted. Even at the time of trial, Mother claimed to have a new apartment, but she had not seen it yet or worked out the details. Mother also lacks stable employment, does not see the need to get a long-term job, has not held a job in years, and resorts to re-selling unwanted items online to make money.

Additionally, Mother is a methamphetamine user. Mother did have one clean drug test, which occurred immediately after her release from jail in Bandera, Bexar, and Nueces Counties. However, within two months, Mother tested positive for methamphetamines again. Witnesses testified to seeing drug paraphernalia in Rashid's apartment and Department witnesses testified that Mother had not completed any of the drug treatment requirements under the family service plan.

Mother has known mental health issues, but also refused to seek treatment for them. Great-Uncle testified that Mother was a functioning parent when she sought treatment for her mental health issues and took her medications. However, Mother's mental health seemed to deteriorate further once she became a regular methamphetamine user, and multiple witnesses also testified that her delusional and paranoid behavior was a known effect of methamphetamine use.

Grandfather stated he did not feel Mother would take advantage of the programs and get the help she needed in order to parent Child. Child came to his grandparents as a frightened child who whimpered in his sleep and feared being taken by "bad people." After spending time in a stable environment, Child was no longer scared of law enforcement, seemed happy and well-adjusted, and was confident when visiting with caseworkers. The fact that Mother refuses to get help for her mental health and drug abuse issues, along with her lack of permanent housing or stable employment, would place Child's well-being in constant danger if Child were returned to her.

These factors weigh in favor of termination.

**(d)     the parental abilities of the individuals seeking custody**
**(e)     the programs available to assist these individuals to promote the best interest of the child**
**(f)     the plans for the child by these individuals or by the agency seeking custody**
**(g)     the stability of the home or proposed placement**

"A child's need for permanence through the establishment of a 'stable permanent home' has sometimes been recognized as the paramount consideration in a best-interest determination." *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.). "Therefore, evidence about the present and future placement of the

21

children is relevant to the best-interest determination." *Id.*

Child is currently placed with Grandfather and Grandmother in a home large enough to accommodate his needs. Aunt and her family, as well as Grandmother's family, all live within a close distance to Grandfather and Grandmother. There was testimony that the family frequently gets together for dinners and to allow Child to play with his cousins. Grandmother testified that Child was involved in sports, attended school, and went on weekend trips with the family.

There was substantial evidence that Child is safe and happy in his current placement with Grandfather and Grandmother. Grandmother testified that Child was afraid "bad people" were going to take him away when he first arrived with them. Caseworkers could see how Child felt loved and safe with his extended family around and knew where he belonged within the home. Child understood the rules of the home and was able to articulate them to the workers, as well as show them his bedroom. The caseworkers testified that Child was articulate and engaging with them and did not show signs of fear with his family present. The Grandparents have worked with Child to overcome his negative perception of law enforcement by taking him to the local police department to meet officers and negate his past negative experiences. "Evidence that a child is well-cared for by his foster family, is bonded to his foster family, and has spent minimal time in the presence of a parent is relevant to the best interest determination under the desires of the child factor." *In re R.A.G.*, 545 S.W.3d at 653.

Mother, however, was planning on getting a new apartment in the days following trial but had not worked out all the details. Mother also explained that she would be working with a "friend" at his landscaping business but did not have many additional

22

details to add. Mother described her life as "cyclical" and blamed her family for any misfortunes she confronted. During her testimony, Mother did not speak about how her upcoming living situation would include Child or testify to having him be a part of her life. Mother's testimony mainly focused on her, not the reason she was in court.

Based on the evidence, Mother had no concrete plans on how to accommodate Child if he was returned. Child is currently placed with his maternal relatives in a happy and stable home. This factor weighs in favor of termination.

### 3.    Summary

Applying the high standard of evidence required in parental termination cases, we hold that the evidence was sufficient to support the trial court's findings of violations under section 161.001(b)(1)(D) and (E). *See In re H.R.M.*, 209 S.W.3d at 108. Mother's drug use, refusal to seek drug or mental health treatment, and instability in her life support a finding of sufficient evidence. *See* TEX. FAM. CODE. ANN. § 161.001(b)(1)(D), (E); s*ee In re J.F.C.*, 96 S.W.3d at 266.

Additionally, regarding the best interest of the children, we find the evidence was legally and factually sufficient. Not only did Mother place Child in an unsafe environment, after their removal, it was clear Mother had no interest in getting the help she needed. The trial court gave Mother ample time and opportunity to comply with the family service plan, but based on the testimony, that compliance never came. The evidence supports the trial court's finding that Child's best interests is served by termination. We overrule Mother's second issue.

### III. CONCLUSION

The judgment of the trial court is affirmed.

GINA M. BENAVIDES,
Justice

Delivered and filed the
4th day of April, 2019.